UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal No. 08-123-P-H |
| | ) | |
| MICHAEL BERNIER, JR., | ) | |
| | ) | |
| Defendant | ) | |

### RECOMMENDED DECISION ON MOTIONS TO DISMISS AND TO SUPPRESS

The defendant, charged with knowing and unlawful possession of an unregistered modified firearm, in violation of 26 U.S.C. §§ 5861(d), 5841, 5845(a) & (d) and 5871, Indictment (Docket No. 1), has filed a motion to dismiss the indictment on the ground of pre-indictment delay and a motion to suppress. An evidentiary hearing was held before me on October 28, 2008, at which the defendant appeared with counsel. Five exhibits were offered by the government and admitted without objection. Three witnesses testified for the government.

At the close of the hearing, counsel for the defendant acknowledged that the evidence did not reach the level required by applicable case law to entitle the defendant to dismissal of the indictment on the ground of pre-indictment delay. I accordingly recommend that that motion (Docket No. 15) be denied.

With respect to the motion to suppress statements the defendant made on April 29, 2004, May 17, 2004 and June 14, 2004 (Docket No. 14), I recommend that the following findings of fact be adopted, and that the motion be denied.

## I. Proposed Findings of Fact

Sometime in early 2004, William Tapley, a detective with the Lisbon, Maine, police department assigned to the Central Maine Violent Crimes Task Force, began to investigate a possible illegal possession of a firearm in Harpswell, Maine, as a result of information he received while working with a confidential informant on a drug case. When asked if he or she knew anything about stolen firearms, the confidential informant said that Robert Hespe was in possession of a stolen firearm. Tapley then investigated Hespe and his associates, interviewing a number of witnesses in the Lisbon area. He learned that Hespe, Jonathan Chartier, and two juveniles went to the defendant's house in Harpswell on February 21, 2004 to steal marijuana and money that they believed to be inside. Hespe and Chartier entered the house, were unable to locate the money or any usable marijuana, although they saw a marijuana "grow" of immature plants inside the house, and instead stole a .357 magnum handgun and a sawed-off shotgun. Chartier had purchased marijuana from the defendant over 100 times. Tapley recovered the firearms through Hespe. The defendant had not reported the theft of the firearms.

Because possession of the sawed-off shotgun appeared to be a federal crime, Tapley contacted the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"). On April 29, 2004, Tapley, ATF Agent Christopher Durkin, and Maine Drug Enforcement Agency ("MDEA") Agents Sean Joseph Lally and Nathaniel Goodman went to Harpswell to speak with the defendant about the firearms and the marijuana grow. That morning, they met at a baseball field that was anywhere from three-tenths of a mile to a mile from the start of Bernier Lane, a dirt road on which the defendant's house was located. Tapley and Durkin drove down Bernier Lane while the MDEA agents waited in a vehicle on the side of the road at the entrance to Bernier Lane, from where they could not see the defendant's house.

Tapley and Durkin did not know beforehand which house was the defendant's in what appeared to be a family compound on Bernier Lane, but they found him walking around outside what they determined to be his house and talked to him beside his truck. They identified themselves and told him that they had come to ask about stolen firearms that had been recovered by law enforcement. Tapley told the defendant about the firearms at issue and showed him photographs of the recovered firearms (Government Exh. 1 & 2). The defendant identified the guns as his. He said that they had been taken from his house without his permission in February. When the agents began to ask additional questions about the guns, the defendant appeared nervous and said that he had to go to his work as a clammer. He agreed to meet the agents at 4:00 that afternoon at his house. The agents drove away, headed for the baseball field, and the defendant drove out after them in his truck.

MDEA Agent Goodman remained in the unmarked vehicle parked near the entrance to Bernier Lane. As the other agents neared the baseball field, Goodman called them to report that the defendant had driven out of Bernier Lane, then turned around and driven back in. Fearing that the defendant would destroy the marijuana grow or hide other weapons, all of the agents drove down Bernier Lane to reconnect with the defendant. As they approached, Tapley and Lally saw a man, later determined to be the defendant's father, running from the defendant's house toward another house that was later determined to be the father's residence. Lally told Tapley that he thought that the man was carrying a rifle or shotgun. Tapley pursued the defendant's father, who when questioned denied running from the defendant's house. Tapley then returned to the vicinity of the defendant's house.

Lally again spoke with the defendant outside his house. During the conversation, Lally told the defendant that the individuals who had stolen his guns had said that there was a

3

marijuana grow inside the defendant's house. The defendant responded that he used marijuana, but did not have a grow. Lally asked whether there were drugs or firearms in the defendant's truck or house. The defendant said that there was a handgun on the front seat of his truck and that there might be firearms in his house. The defendant eventually consented to a search of his residence, but only on condition that the search be conducted by the four agents who were then present. After signing a consent form for the search, the defendant was told that he would not be arrested that day, no matter what the agents found.

The defendant went into his house with the agents, one of whom stayed with the defendant while the others searched. After searching upstairs in the small house, Tapley sat with the defendant at his kitchen table. He told the defendant that he was not under arrest and did not have to answer Tapley's questions. He told the defendant that he was involved in a federal investigation of the possession of the sawed-off shotgun by a person who was a drug user and that he was interested in how the shotgun came to be sawed-off. The defendant told Tapley that he had purchased the shotgun, with the barrel already shortened and painted, from Jody Harnden about 10 months earlier.

On May 17, 2004, Tapley and Durkin returned to the defendant's house at the behest of an assistant United States attorney to retrieve other firearms that had been seen on April 29 in a gun safe on the second floor. No one discussed the shotgun with the defendant on this day. The agents asked the defendant where the firearms were, and he replied that he no longer had them. When asked who did, the defendant said that he had lied and the guns were at his father's residence. The agents retrieved them.

On June 14, 2004, Tapley asked the defendant to come to the Lisbon Police Department to speak with him about what other witnesses had said about the shotgun. When the defendant

arrived at the police station, Tapley told him that he was not under arrest nor would he be charged with a crime that day, and the defendant acknowledged that he knew that he did not have to speak with Tapley and could leave at any time. Tapley and the defendant proceeded from the lobby of the police station into a locked area where Tapley's office was located. Tapley told the defendant that, based on what other witnesses had told him, he believed that the defendant had shortened the barrel of the shotgun and painted it. Despite the fact that he had earlier told Tapley that he had painted the barrel of the shotgun, the defendant now denied that he had shortened *or* painted the barrel, then asked whether things would be easier for him if he admitted that he had done these things. Tapley replied that it would not, and the defendant maintained his denials.

In his interviews with other witnesses regarding the shotgun, Tapley told the witnesses that they did not have to talk with him, and that they could hire a lawyer. Specifically, he told Chartier and Hespe that they might want to hire a lawyer before speaking with him. He did not tell the defendant at any time, however, that he might want to hire a lawyer before speaking with him.

## II. Discussion

At the close of the hearing, counsel for the defendant conceded that the initial interview of the defendant in his driveway on April 29, 2004 with Tapley and Durkin could not be characterized as custodial interrogation. Thus, counsel indicated that the defendant did not press the motion to suppress as to anything the defendant might have said during that conversation. However, he maintained that any discussions with the defendant thereafter were conducted under circumstances that were the functional equivalent of custodial interrogation, and, therefore, any statements made by the defendant at those times should be suppressed.[1]

---

[1] Counsel for the defendant did not mention the argument asserted in his brief that his consent to search his house on April 29, 2004 was involuntary "in light of agent Lally's ultimatum." Motion to Suppress Statements and Physical

> *Miranda* [*v. Arizona*, 384 U.S. 436 (1966)] requires law enforcement officers to employ procedural safeguards to ensure that a suspect's Fifth Amendment privilege against self-incrimination is respected. Under *Miranda*, a suspect is entitled to be apprised of his right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. To comply, the police must give a suspect proper *Miranda* warnings before he is subjected to custodial interrogation. Any statements obtained as a result of custodial interrogation in the absence of *Miranda* warnings must be suppressed.

*United States v. Jackson*, __ F.3d __, 2008 WL 4499991 (1st Cir. Oct. 8, 2008), at *3 (citations and internal punctuation omitted).

Since the defendant admitted during the first conversation with Tapley, which he no longer challenges, that the guns at issue were his, I am not sure that any discussion of the voluntariness of his remaining statements has much more than academic import. I will nonetheless proceed to analyze the circumstances of the defendant's remaining interactions with the agents in case any of his statements may come to be seen as possibly incriminating.

The defendant's memorandum contends that he "face[d] the functional equivalent of custodial interrogation" when he was told by Lally "that he could cooperate, talk to the agents and let them search his home, or he would be detained while the agents sought a warrant." Motion at 5. In oral argument at the close of the hearing, counsel for the defendant added that when the defendant was questioned on April 29 at his kitchen table, "he could not just walk away and leave," and that the June 14 interview at the Lisbon police station was custodial because Tapley conducted it in his office, in a secure (locked) part of the building.[2]

---

Evidence ("Motion") (Docket No. 14) at 6. If the claim has not thus been waived, I recommend that the court deny the motion to suppress on this basis, because there is no evidence that Lally delivered an "ultimatum" to the defendant or that the defendant was told, as the motion asserts, that he would be "held" while the agents sought to obtain a search warrant. Nothing in the evidence presented at the hearing suggests that Lally either broke or overbore the defendant's will in this regard. *See United States v. Barnett*, 989 F.2d 546, 554-55 (1st Cir. 1993).

[2] If the defendant means also to assert that he was subjected to custodial interrogation on May 17, 2004, when some of the agents returned to his residence and removed "a number of long barrel guns and related ammunition," Motion

For purposes of the Fifth Amendment, which is the Constitutional basis of the defendant's motion to suppress any statements that he may have made at the designated times, a person is "in custody" when he has been formally arrested or has had his freedom of movement restrained to the degree associated with a formal arrest. *United States v. Ventura*, 85 F.3d 708, 710 (1st Cir. 1996). Whether the restraint on movement is sufficient to rise to the level of arrest depends on the objective circumstances and how they would be perceived by a reasonable person standing in the shoes of the suspect. *Id*. at 711.

> Relevant circumstances include whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation.

*Id*. (quotation marks and citation omitted); *accord, United States v. Nishnianidze*, 342 F.3d 6, 13 (1st Cir. 2003).

With respect to the first instance in which the defendant apparently seeks to suppress his statements, his second encounter with the agents in his driveway on April 29, 2004, the evidence does not support his assertion that he was told that he would be detained while the agents tried to obtain a search warrant if he refused to consent to a search of his home. The conversation took place outside the defendant's home, in his driveway. The four agents, all of whom were in civilian clothes and none of whom drew a weapon, agreed that no other law enforcement officers would be involved in the search. No physical restraint was placed on the defendant. Lally told the defendant that he would not be arrested no matter what was found inside the house. He testified that the conversation was not strained, and that the defendant showed no sign of second

---

at 3, there is no evidence, contrary to the assertion in the defendant's motion, that "the officers [again] questioned Bernier about guns," *id*., let alone the only gun at issue in the indictment, the sawed-off shotgun. Tapley, the only witness questioned on this point, testified that the agents who went to get the defendant's guns that day did not discuss the stolen sawed-off shotgun with him and that the only questions he asked about guns was about the whereabouts of the guns that the agents had come to get.

7

thoughts after signing the consent form, which Lally read and explained to him before he signed. During this conversation Lally also told the defendant that the agents had reason to believe that there was a marijuana "grow" inside the house and asked him whether he had any drugs or guns in his truck. He characterized the conversation as "short" and "very calm." According to Durkin, Lally even told the defendant that the agents might not be able to get a search warrant. Any statements made by the defendant during this encounter need not be suppressed.

The conversation at the kitchen table was between Tapley and the defendant. Tapley testified that during this conversation he explained to the defendant that two investigations were taking place: a state investigation of the marijuana grow and a federal investigation of the possession of the sawed-off shotgun. He told the defendant that he was not under arrest and did not need to answer Tapley's questions. Tapley described the atmosphere in the kitchen at that time as "very casual." Tapley and the defendant talked about the sawed-off shotgun. Again, the evidence does not establish that the defendant was placed in the functional equivalent of custody during the kitchen table conversation on April 29, 2004.

With respect to the June 14, 2004, interview at the Lisbon police station, Tapley called the defendant and asked him to come to the police station to talk about what other witnesses had told him about the shotgun. The defendant drove the considerable distance from Harpswell to the Lisbon police station of his own accord. In the lobby of the police station, Tapley told the defendant that he was not under arrest and would not be charged with a crime that day. The defendant told Tapley that he understood, and that he knew that he did not have to speak with Tapley and could leave at any time. The mere fact that the two then went through a locked door in order to reach the privacy of Tapley's office for further conversation does not render the encounter one in which the defendant was restrained to the degree associated with a formal

arrest. *United States v. Quinn*, 815 F.2d 153, 160 (1st Cir. 1987) (citing *California v. Beheler*, 463 U.S. 1121, 1125 (1983)). Here too, the defendant's statements during this police station interview need not be suppressed.

### III. Conclusion

For the foregoing reasons, I recommend that the proposed findings of fact herein be adopted and that the motion to suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which de novo review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within ten (10) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within ten (10) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to de novo review by the district court and to appeal the district court's order.*

Dated this 3rd day of November, 2008.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge